VAN KEUREN-ROGERS-TEMPLETON CO. *v.* PARKER RUST PROOF CO. OF AMERICA.

1. BROKERS—COMMISSIONS—SALE OF STOCK—CONTRACT—STIPULATED DAMAGES—BREACH OF CONTRACT.

Where plaintiff, a brokerage firm, contracted to sell an issue of stock for defendant corporation, agreeing that a certain per cent. of the commission should be withheld by

defendant as stipulated damages in case plaintiff failed to perform, and defendant agreed to use its best efforts to prevent the sale of stock then held by stockholders, plaintiff could not urge, in an action for the money withheld, that it was prevented from performing by the action of defendant's president in selling below par some stock which he, with plaintiff's assistance, illegally received after the making of the contract, where none of the proceeds of the sale went to defendant, and it was the party wronged by the issue and sale of said additional stock.

2. SAME—BREACH OF CONTRACT — MISMANAGEMENT — EVIDENCE — SUFFICIENCY.

Plaintiff's claim that it was prevented from performing by reason of defendant's mismanagement of the business, *held*, not sustained by the record.

3. SAME—STIPULATED DAMAGES—VALIDITY.

On the record as made, there being no claim that the provision of the contract as to stipulated damages was invalid, defendant was entitled to a directed verdict.

Error to Wayne; Mayne (Frederick W.), J., presiding. Submitted October 25, 1921. (Docket No. 104.) Decided December 21, 1921. Rehearing denied March 31, 1922.

Assumpsit by Van Keuren-Rogers-Templeton Company against the Parker Rust Proof Company of America for commissions on the sale of certain stock. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial ordered.

*Angell, Turner & Dyer,* for appellant.

*Bailey & Bradley,* for appellee.

CLARK, J. In 1916 the plaintiff was a broker. Van Keuren, Rogers, and Templeton were its stockholders and officers. It had just finished selling an issue of stock for the Weiss Fibre Company and desired another engagement. The defendant had just determined to increase its capital stock from $100,000 com-

mon to $300,000 common. A majority of its stock
was owned by C. W. Parker and his son. Parker
then desired an increase to $300,000 only. But con-
ferences were had between Parker and the officers
of plaintiff in which a large increase was considered.
Parker was willing. But before going into the scheme
he insisted that he be shown how to get $1,000,000 in
cash for defendant, and how he might acquire, under
the scheme proposed, control of the corporation, 51%
of the voting power. Plaintiff showed him. They
agreed upon a plan which was carried out in a general
way.

The million dollar part was simple,—engage the
plaintiff to sell to the public $1,200,000 of stock at a
commission of 16 2-3 per cent.,—$200,000 for plain-
tiff, $1,000,000 for defendant. But to get control for
Parker was not so simple. The capital stock was to
be increased from $100,000 to $2,300,000—$1,700,000
common, $600,000 preferred, the par value of the
shares to be $100. The $1,200,000 to be sold was to
be $600,000 common, $600,000 preferred. The articles
when amended should deny to preferred stockholders
the right to vote at the election of directors. So Parker
must have 51% of the common stock, which was 17,000
shares, or 8,670 shares. Parker had 372 shares, his
son 200 shares, the other stockholders 428 shares.

The other shares were to be provided for Parker
as follows: issue to him 8,000 shares for the assign-
ment of a patent, have the securities commission au-
thorize the issue of such stock and the sale of 14,000
shares, sell but 12,000 and take from the defendant
corporation 2,000 of its shares under an arrangement
that Parker assign another patent to the defendant for
which its directors should vote to issue to him the 2,000
shares. But these were to be divided among certain
of the stockholders of defendant. The stockholders
it seems owning the 428 shares of the old stock were

to receive from Parker of the 2,000 shares, four shares in addition to each share they then owned or 1,712 shares.   This was not a "four for one" arrangement as contended by plaintiff's counsel.   It was "four to one."

This then would give Parker the difference between 1,712 shares and 2,000 shares or 288 shares.   Therefore his holding of common stock was to be 372 shares, 8,000 shares, and 288 shares or 8,660 shares, within 10 shares of the 51% and 160 shares more than half of the common stock.

As a further boon to the old stockholders, plaintiff agreed to sell for them without charge $89,000 of stock, if requested, and this in addition to $1,200,000 to be sold for the company.

Accordingly the action of defendant's directors in voting an increase to $300,000 was rescinded and an increase to $2,300,000 was voted, with desired amendments to the articles, including a provision denying preferred stockholders the right to vote for directors. A resolution was also adopted providing that Parker might have the 2,000 shares.

The articles were so amended.   The securities commission permitted the issue of 8,000 shares for the patent and the sale of 14,000 shares, but required that the patent stock and 500 shares additional be escrowed in the State treasury.   This was done, the 500 shares being provided by Parker and the son from their original stock.   The arrangement as to the 2,000 shares was not revealed to the commission.

The arrangement as to this stock did not include, it seems, stock owned by the son, 200 shares.   It could not have applied to him, there being insufficient shares. The father later transferred to the son from other stock shares in excess of such ratio.   The arrangement as to giving "four to one" seems not to have been in writing.   Counsel for plaintiff state that the "four to

one" agreement was to be satisfied from the escrowed stock. The record states otherwise, although it does appear that later Parker transferred some of such stock to the old stockholders. Plaintiff's said officers received from Parker upon 37 shares of such old stock under the scheme of distribution, 150 shares.

On August 16, 1916, the contract to sell the 12,000 shares was made by the parties. The substance of it here important is stated by counsel:

"By it the plaintiff company was given the exclusive right to sell, at par, 12,000 shares of the newly authorized capital stock,—6,000 common and 6,000 preferred. The stock was authorized to be sold on deferred payments, the plaintiff to be paid a commission of 16 2-3 per cent. of the par value of each share of stock sold, said commission to be paid as follows:

"Fifteen per cent. of the subscription if subscription is paid in full in cash.

"Thirteen per cent. if 20 per cent. of the subscription is paid in cash, and the balance on time.

"Fourteen per cent. if 50 per cent. of the subscription is paid in cash and the balance on time.

"The plaintiff agreed that the balance of the commission should be held by the defendant as an evidence of good faith, that the terms of the agreement would be carried out and the 12,000 shares of stock sold and disposed of, and that the stock of the original stockholders which the second party might be requested to sell should be sold under the terms and conditions set forth, provided, however, if this contract should be terminated by either of the parties hereto before the plaintiff has disposed of the 12,000 shares of stock and such original stock as it is requested to sell, then the unpaid balance of commission should be retained by the defendant as stipulated damages for the performance by the second party of the agreement.

"When the issue of 12,000 shares should be disposed of, the plaintiff agreed to sell, without charge to the original stockholders, stock owned by them to the amount of not exceeding $89,000, provided that said original stockholders should notify the plaintiff of their desire to sell within 90 days from date.

"If the plaintiff should not have disposed of 4,000 shares of stock within six months from date, the defendant might terminate the plaintiff's rights under the contract.   But if 4,000 shares of stock should have been sold within that period, a further extension of six months was, to be given to the plaintiff to dispose of the balance of stock."

Plaintiff began selling.   It sold enough stock in the first six months to entitle it to the extension of six months.   Parker assigned the other patent to defendant company and in January, 1917, there were issued to him certificates for the 2,000 shares.

Upon receiving the 2,000 shares of stock, Parker at once began peddling it, sold 907 shares at various prices, receiving in the aggregate about $30,000 or $40,000.   Some of his sales were made through salesmen of plaintiff without its knowledge.

Counsel for plaintiff contend that defendant received the proceeds of these sales.   This may not be inferred from the record.   Parker said that he spent such proceeds and more to further the interests of the defendant company.   He loaned some of the money to the company, but it was repaid.   None of the proceeds were received by defendant.   Parker's selling of such stock ended July 16, 1917.   Plaintiff knew that Parker was selling but the extent of the knowledge is in dispute.

Beginning with December, 1916, there was gradual and steady decline in the value of the shares.   On August 1, 1917, the parties made a supplemental agreement extending the time of performance to March 1, 1918, taking from plaintiff the exclusive right to sell stock but providing for credit upon performances but without commission for all sales made by defendant, requiring sales to be at par equally of common and preferred, stating that plaintiff had sold 5,166½ shares of common and 4,576½ shares of preferred

and that the amount of withheld commission under the contract was $25,378.67, and providing that the original agreement was not otherwise changed. Plaintiff made no further sales. It was paid in commissions $136,868.

The securities commission discovered upon an inspection the arrangement as to the 2,000 shares and required, to avoid proceedings, an immediate adjustment. By agreement between Parker and defendant and by order of the commission, Parker, for the 907 shares he had sold gave his note to defendant due in two years secured by collateral, for the sum of $90,700 and returned to defendant 1,093 shares remaining of the 2,000 shares. The note was later paid by surrender of 2,000 of the shares.

The value of the stock continued to sag. Another supplemental agreement extending time for sale of the remainder of the stock at a price below par was attempted but, the commission refusing approval, it did not become effective.

Defendant in the meantime had made extensive preparations for business by purchasing land, erecting buildings, providing offices and equipment, purchasing other patents, and employing men.

In the fall of 1917 the defendant was in financial strait, but, by retrenchment, re-organization, decrease of capital stock, a note issue of $100,000, a bond issue of $250,000, a sale of its plant and property and the purchase of smaller buildings and less land, it finally came through to a successful business and satisfactory profits.

Plaintiff's suit is to recover the commission withheld under the contract, $25,378.67, and interest thereon, $3,236.69, damages claimed for prevention by defendant of sale of the remainder of the 12,000 shares, being 2,257 shares, $14,216.21, and commission on the transfer to Parker of the 2,000 shares. It appeared

that plaintiff had sold certain shares of common stock at $5,000 above par, which amount, it was agreed, would be equalized upon a later sale of preferred stock which was not done.    Defendant also has plaintiff's note for $5,000 and interest, $5,823.33.    The jury was instructed not to allow commission on any of said 2,000 shares.    The jury returned a verdict of $32,268.54 upon which judgment for plaintiff was entered.

Defendant assigning error contends that a verdict should have been directed in its favor as requested. The contract was not fully performed.    To avoid the provision of the contract respecting the retaining by defendant of the withheld commissions as stipulated damages for failure to perform, plaintiff claimed defendant had prevented performance by selling stock contrary to the agreement and below par, thus causing such a decline in value that plaintiff was unable to sell the remaining shares at par, and that there was a like prevention by the mismanagement by defendant of its business.

Parker sold the shares below par.    The defendant did not.    Defendant got none of the proceeds.    Neither of the parties hereto upon the contract between them could have enjoined the sale of these shares by Parker. The defendant corporation may not be held liable for Parker's acts in this regard.    True, the contract provided that the defendant use its best efforts to prevent sale during the life of the contract of stock then held by the stockholders.    But the stock sold by Parker was not then held.    It was issued months later.    It was not a part of the 12,000 shares to be sold by plaintiff.    Parker agreed with plaintiff at the time it, by its officers, to obtain the contract, aided Parker to get, wrongfully and unlawfully, the certificates for the 2,000 shares, that he would refrain from converting to his own use by a sale thereof, any of the said cer-

tificates, until plaintiff had secured full benefit under its contract by selling the 12,000 shares. Plaintiff may not complain of Parker's breach of this agreement, much less direct its complaint against defendant, the party wronged by the issue of the 2,000 shares and the party who had the greatest interest in maintaining its shares at par.

Respecting mismanagement the principal complaint is that defendant bought more land than was needed, its buildings cost too much and were larger than necessary, its offices were too elaborate, it ordered trucks, paid large salaries, in short made unnecessarily large and elaborate preparations for business. And it is pointed out that later the land and buildings were sold and smaller buildings and less land purchased, the order for the trucks was cancelled, salaries were reduced, there was a general retrenchment and change to less elaborate and expensive equipment for business. But defendant and its officers in this regard acted in good faith. The claim that they acted otherwise has no support in the record.

The patents covered a process of rust proofing metals. Defendant sought to engage in such business. It was a pathfinder in a strange and new field. Success was sought, but where it was and the way to it were not known. The goal was reached. May defendant be mulcted in damages for not reaching it by a direct path?

The plan at first was to treat metals of the trade at its plant with the rust proofing materials. This would require, if successful, a large plant, extensive equipment, preparation and activity. But it was learned by experience that this was too expensive, impracticable if not impossible. Defendant's opportunity was in furnishing to the trade the rust proofing material and equipment and licensing their use. Hence the change in the plan of the business. It was

found necessary to acquire for the protection of the business other patents.   This was done by purchase and is criticized.   This is a common experience of those operating under patents and an incident of progress.   And the criticism comes with poor grace from plaintiff.   Templeton, its vice-president, acquired one of the patents and transferred it to defendant and, to provide funds toward the purchase of another, plaintiff made an unusual effort toward selling the stock and, with Parker's consent, sold a large block at 94, perhaps 95.

There is no merit in the complaint of the payment of a note due Parker for $13,000 at a time when defendant had his note for $90,700, secured as aforesaid, due in two years.

Defendant gave Parker a license for the State of New York for $25,000, $7,500 cash, balance deferred. There was some dealing in Ohio in which Parker owed the company about $8,000.   The cancellation of the New York license was agreed upon by defendant's retaining the down payment and charging off the Ohio account.   This upon the record was not bad management.

Defendant, because of its extensive and expensive preparation for business and the failure of the plan for stock selling, got short of cash, fearful of litigation and receivership, but this we think has been covered by what has been said, and this also may be said as to the salaries paid under the original plan.

We think it unnecessary to pursue the subject further.   There was no evidence of such mismanagement as would entitle plaintiff to go to the jury upon that question.

The instruction that plaintiff could have nothing because of the transfer of the 2,000 shares and the sale of part of them was clearly right and plaintiff has not sought review.   It is not claimed that the

provision of the contract as to stipulated damages is invalid.   It follows that a verdict for defendant should have been directed.

Although defendant with its plea gave notice of set-off as to plaintiff's note for $5,000 and although it appears that plaintiff has $5,000 of defendant arising as aforesaid upon a sale of common stock, counsel for defendant request that the judgment be reversed without a new trial.

Judgment reversed without a new trial.

STEERE, C. J., and MOORE, WIEST, STONE, BIRD, and SHARPE, JJ., concurred.   FELLOWS, J., did not sit.